**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 17-519** |
| **ROBERT MACK, (1)** | : | |
| a/k/a "Tweet," | | |
| **KENNETH RILEY, (2)** | : | |
| a/k/a "Kenny," | | |
| **JAMES WILSON, (3)** | : | |
| a/k/a "JT," | | |
| **MARK SAMUEL, (5)** | : | |
| **XAVIER TOWEL, (6)** | | |
| a/k/a "Zay," | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The government submits its Trial Memorandum in advance of the trial of the above-named defendants.   Trial is scheduled to begin on October 9, 2018.

**I.     The Indictment**

On September 27, 2017, defendants Robert Mack, Kenneth Riley, James Wilson, Clayton Roberts, Mark Samuel, Xavier Towel, and Sir Robert Keen, were charged in a multicount indictment[1].   All defendants were charged at Count One with conspiracy to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. § 846.   Defendants Riley and Wilson were charged at Count Two with conspiracy to use, carry and discharge a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(o).   Defendants Riley and Wilson were charged at Count Three with the use, carrying, and discharge of a firearm during and in relation to a drug

---

[1] Defendants Roberts and Keen subsequently pled guilty to their respective charges.

trafficking crime, and aiding and abetting, in violation of 18 U.S.C. § 924(c)(1)(A) and 2.

Defendant Wilson was charged at Count Four with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). Defendant Samuel was charged in Counts Nine and Eleven, and Ten and Twelve, with distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and distribution of cocaine base within 1,000 feet of a protected location (a public playground), in violation of 21 U.S.C. § 860(a), respectively. Defendant Mack was charged in Counts Thirteen and Fourteen with distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and distribution of cocaine base within 1,000 feet of a protected location (a public playground), in violation of 21 U.S.C. § 860(a), respectively. Defendant Mack was also charged in Counts Fifteen and Sixteen with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), respectively.

## II. The Elements of the Offenses

To establish a violation of Title 21, United States Code, Section 846 (conspiracy to distribute 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack") (Count One)), the government must prove the following elements beyond a reasonable doubt:

(1) That two or more persons agreed to distribute or possess with the intent to distribute a controlled substance;

(2) The defendant was a party to or member of that agreement;

(3) The defendant joined the agreement or conspiracy knowing of its objectives to distribute and possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve those objectives;

(4) That cocaine base is a Schedule II controlled substance; and

(5)     That the amount of cocaine base attributable to the defendant as a result of his own conduct and conduct reasonably forseeable to him was 280 grams or more.   21 U.S.C. § 841(b)(1)(A).   (Apprendi v. New Jersey, 530 U.S. 466 (2000)).

To establish a violation of Title 21, United States Code, Section 841(a)(1), the government must prove the following elements beyond a reasonable doubt:

(1)     The defendant distributed cocaine base; and

(2)     Did so knowingly and intentionally.

To establish a violation of Title 21, United States Code, Section 860(a), the government must prove the following elements beyond a reasonable doubt:

(1)     The defendant knowingly and intentionally distributed cocaine base; and

(2)     At the time of such distribution, the defendant knew that the substance distributed was a controlled substance; and

(3)     The distribution or premises was within 1,000 feet of a playground.

To establish a violation of Title 18, United States Code, Section 924(o) (conspiracy to violate Title 18, United States Code, Section 924(c)), the government must prove that the defendant joined a conspiracy to commit the use of a firearm during and in relation to a drug trafficking crime.   The statute reads as follows: A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

To establish a violation of Title 18, United States Code, Section 924(c) (carrying, using and discharging a firearm during and in relation to a drug trafficking crime), the government must prove the following elements beyond a reasonable doubt:

(1)     The defendant committed a drug trafficking crime for which he may be prosecuted in a court of the United States;

(2)     The defendant knowingly possessed, used, carried, brandished or discharged a firearm; and

(3)     The use, carrying, brandishing or discharge of the firearm was during and in relation to the defendant's drug trafficking crime.

To establish a violation of Title 18, United States Code, Section 2 (aiding and abetting), the government must prove beyond a reasonable doubt:

(1)     The defendant knowingly and intentionally associated himself with the criminal venture;

(2)     The defendant participated in the venture as something he wished to bring about; and

(4) The defendant took action to make the criminal venture succeed.

## III.     Summary of the Evidence

All of the charges in the indictment arise out of the defendants' joint participation in a single drug-trafficking organization that distributed crack cocaine in and around an area known colloquially as "the Grounds" – a playground/basketball court located near the intersection of 52nd Street and Westminster Avenue in the Mill Creek section of West Philadelphia.    The territory of crack distribution was located within the playground basketball court, as well as within 1,000 feet of a second playground located at the intersection of 52nd Street and Wyalusing Avenue.     The organization operated to distribute crack cocaine from at least as early as 2010 and continued through 2015.

The organization was led by an individual ("Person #1) that purchased sums of cocaine and crack cocaine from his supplier, defendant Robert Mack.    Person #1 then converted cocaine into

crack cocaine and packaged the crack cocaine into distribution amounts.   Person #1 then provided

the crack cocaine to his sub-distributors, defendants Kenneth Riley, James Wilson, Clayton

Roberts, Mark Samuel, Xavier Towel, Sir Robert Keen, and others who sold the sums of crack

cocaine to customers in "the Grounds."

Beginning in summer 2013, Bryant Calloway, a member of a nearby and competing drug

distribution organization that operated out of an area surrounding another playground colloquially

called "the Pit", a playground/basketball court located near the intersection of 51st Street and Reno

Street in the Mill Creek section of West Philadelphia, began making attempts to take control of a

portion of the crack sales being conducted in "the Grounds."[2]   Calloway and others felt that they

were not selling enough crack near the "the Pit" and sought to sell crack at night in "the Grounds,"

which had a higher volume of crack customers and presented an opportunity to make more money.

"The Grounds" organization resisted "the Pit's" requests to sell crack in "the Grounds." As a result

of this dispute, on August 5, 2013, Calloway and other individuals entered into "the Grounds" and

shot and killed Brian Littles, a crack distributor for "the Grounds" organization and former

coconspirator of the defendants.

In retaliation for the murder of Littles, members of "the Grounds" organization conspired

to shoot Calloway.   Specifically, defendant's Riley and Wilson, as well as Person #1 and Person

#2 attempted to locate Calloway in order to shoot him in retaliation.   In furtherance of that

conspiracy, on the night of November 22, 2013, defendant James Wilson took a loaded firearm

---

[2]  Many members of the organization that controlled crack sales in "the Pit" have been indicted
separately. Those defendants are Bryant Calloway, a/k/a Bigs, Sean Gilliam, a/k/a Skizzy Ones,
Sean Wilson, a/k/a Lil Shizz, Tonie Henderson, and Tyree Johnson, a/k/a Riq.   See Crim. No.
17-518.

from an area within "the Grounds" and shot Calloway in the area of 5100 Reno Street.    Early in the morning police were called to the area of 5100 Reno Street to respond to a report of a person shot.    Officers observed Calloway on the ground suffering from multiple bullet wounds. Calloway survived his injuries, but told officers that he did not see who shot him.

Within twenty-four hours of the shooting of Calloway, a member of "the Pit" crack organization, named Sean Wilson, traveled to the area of N. Paxon Street, an area controlled by "the Grounds" organization, and fired multiple rounds down the residential street. An innocent bystander (not associated with "the Grounds" organization) was shot and injured.

These shootings prompted the ATF to conduct an investigation of each of "the Grounds" and "the Pit" drug trafficking organizations.    The investigation used a number of tools including making controlled purchases of crack cocaine from various members.    Recorded and controlled purchases of crack were made from various defendants, including purchases that occurred on:

(1) August 27, 2014, from Clayton Roberts;

(2) September 17, 2014, from Clayton Roberts;

(3) February 11, 2015, from Mark Samuel;

(4) April 8, 2015, from Mark Samuel;

(5) July 9, 2015, from Robert Mack; and

(6) July 10, 2015, from Robert Mack.

In addition, the ATF reinvestigated several prior incidents in which the defendants were engaged in crimes in connection with, and in furtherance of, the organization's drug trafficking. Some of those prior incidents include:

(1) A conviction of James Wilson for possession with intent to distribute cocaine base

arising from an August 13, 2010, arrest inside of the playground located at 52nd Street and Westminster Avenue;

(2) A conviction of James Wilson for possession with intent to distribute cocaine base arising from an August 24, 2010, arrest inside of the playground located at 52nd Street and Westminster Avenue;

(3) A conviction of James Wilson for possession with intent to distribute cocaine base arising from an October 26, 2010, arrest inside of the playground located at 52nd Street and Westminster Avenue;

(4) A conviction of Xavier Towel for conspiracy arising from a November 30, 2010, arrest for possession with intent to distribute cocaine base inside of the playground located at 52nd Street and Westminster Avenue;

(5) A conviction of James Wilson for possession of a controlled substance and resisting arrest arising from a December 21, 2010, arrest inside of the playground located at 52nd Street and Westminster Avenue;

(6) A conviction of Kenneth Riley for possession with intent to distribute cocaine base arising from a January 11, 2011, arrest near to the playground located at 52nd Street and Westminster Avenue;

(7) An arrest of Kenneth Riley for possession with intent to distribute cocaine base on August 30, 2013, inside of the playground located at 52nd Street and Westminster Avenue; and

(8) An arrest of Xavier Towel for possession with intent to distribute cocaine base on February 7, 2014, inside of 510 North Paxon Street.

On May 7, 2015, as part of the investigation in this case, search warrants were obtained to search a number of locations, including a variety of locations associated with "the Grounds" organization.   The following locations, in addition to others, were searched in connection with "the Grounds" organization:

(1) 510 North Paxon Street;

(2) 525 North Creighton Street;

(3) 8470 Limekiln Pike, Building 2, Penthouse 19; and

(4) 5019 Westminster Avenue.

Following the execution of the May 2015 search warrants, the ATF investigation continued, eventually leading to the arrest of the defendants for this 2017 indictment.

On November 22, 2017, defendant Samuel was arrested pursuant to an arrest warrant, stemming from this indictment.   Following his arrest Samuel was advised of his Miranda warnings by two ATF agents and Mr. Samuel provided a statement to the agents.   Among other admissions, Mr. Samuel stated in sum and substance that, "I began to sell crack cocaine in the playground located at 51 Street and Westminster in February 2015.   I sold for Bo and there were others that sold for him, including 'Brock' and 'Water,' and other people I don't know.   I sold for Bo until there was a search warrant at my family's house."   Mr. Samuel then identified by photograph all of his charged coconspirators in this case (those being Robert Mack, Kenneth Riley, James Wilson, Clayton Roberts, Xavier Towel and Sir Robert Keen) as well as several uncharged conspirators.[3]

---

[3]  Because the admission of such statements would violate the Confrontation Clause as to those co-defendants, these statements will be redacted to eliminate any direct reference to any trial co-defendant.   Bruton v. United States, 391 U.S. 123, 126 (1968); Richardson v. Marsh, 481 U.S.

## IV.     Potential Witnesses

The United States anticipates calling many law enforcement witnesses, civilians, and cooperating witnesses[4] in its case-in-chief.   The government will provide a witness list prior to trial.

## V.     Legal Standards and Potential Trial Issues

### 1.     <u>Conspiracy Generally</u>

Where the indictment charges the existence of a conspiracy containing multiple members, the United States must provide evidence at trial that will allow a reasonable fact finder to conclude beyond a reasonable doubt that the defendant and at least one other person shared a "unity of purpose" or the intent to "achieve a common goal" and an agreement to "work together toward the goal." <u>United States v. Applewaite</u>, 195 F.3d 679, 684 (3d Cir. 1999) (citations omitted).   The United States is not required to prove the existence of an express or formal agreement; "a tacit understanding is sufficient." <u>Agnail v. United States</u>, 420 U.S. 770, 777 n.10 (1975).   Further, proof of the existence of an agreement may be established entirely by circumstantial evidence. Conspiracy law merely requires that the inferences drawn have a logical and convincing connection to the evidence.   <u>Applewaite</u>, 195 F.3d at 684.   Moreover, "juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the

---

200, 211 (1987).

4  Due to security concerns, the government has not included the names of its witnesses.   The government will provide a list of witnesses to the Court prior to *voir dire*.   Prior to the start of trial, the government will provide Jencks material for these witnesses with the names redacted for these witnesses with a corresponding key for defense counsel.

evidence." United States v. Ramirez, 954 F.2d 1035, 1039 (5th Cir. 1992).   To sustain a

conspiracy conviction, the government need only show sufficient evidence that the defendant

conspired with "someone - anyone."   United States v. Pressler, 256 F.3d 144, 149 (3d Cir.

2001)(quoting United States v. Obialo, 23 F.3d 69, 73 (3d Cir. 1994)).

A pattern of sales for resale between the same persons, together with detail supplying a

context for the relationship, might well support a finding of conspiracy.   Even a single sale for

resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, can

suffice.   Common knowledge, interdependence, shared purpose and the other ingredients of a

conspiracy are matters of degree. Almost everything in such a case depends upon the context and

the details. The evaluation of the facts is entrusted largely to the jury.

"The elements of a charge of conspiracy are: (1) 'a unity of purpose between the alleged

conspirators;' (2) 'an intent to achieve a common goal;' and (3) 'an agreement to work together

toward that goal.'"   United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999).   The Court in

Gibbs noted that "even an occasional supplier (and by implication an occasional buyer for

redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of

knowledge that she or he was part of a larger operation.'"   Id. at 198, quoting United States v.

Price, 13 F.3d 711, 728 (3d Cir. 1994), and citing United States v. Theodoropoulos, 866 F.2d 587,

594 (3d Cir. 1989).

The facts that can support the existence of a conspiracy are quite varied.   Some examples

include the following:

- the length of affiliation between the parties, Gibbs, 190 F.3d at 199;

- repeated, familiar dealings, which provide an inference that the buyer "comprehends fully the nature of the group with whom he [or she] is dealing, is more likely to depend heavily on the conspiracy as the sole source of his [or her] drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his [or her] connection to them," id.;

- knowledge of buyer that seller sells to people other than himself; knowledge of seller that buyer is re-seller, Gibbs, 190 F.3d at 201;

- the buyer purchased large amount of drugs from seller, United States v. Pressler, 256 F.3d 144, 153, n.4 (3d Cir. 2001) (citing Gibbs);

- code used in drug transactions, id. (citing Gibbs);

- extensive use of phones between parties involved in drug trafficking, United States v. Rodriguez, 215 F.3d 110, 117 (1st Cir. 2000);

- credit transactions, United States v. Price, 13 F.3d at 728.

"Numerous suppliers and distributors operating under the aegis of a common core group can be treated as a single conspiracy. The government need not prove that each defendant knew all the details, goals, or other participants." Id. at 728, citing Theodoropoulos, 866 F.2d at 593.

In United States v. Perez, 280 F.3d 318 (3d Cir. 2002), the Third Circuit noted several factors that would warrant an inference that defendant was part of a conspiracy:

(1) the length of affiliation between the defendant and the conspiracy; (2) whether there is an established method of payment; (3) the extent to which transactions are standardized; and (4) whether there is a demonstrated level of mutual trust.

Id. at 343 (citations omitted).

While these factors "are not necessarily dispositive of the issue," id., they certainly justify a conclusion that there was a conspiracy. "[T]heir presence suggests that a defendant has full knowledge of, if not a stake in, a conspiracy . . ." Id. "[W]hen a defendant drug buyer has repeated, familiar dealings with members of a conspiracy, that buyer probably comprehends fully the nature of the group with whom he is dealing . . ." Id. The conspirator "is more likely to depend heavily on the conspiracy as the sole source of his drugs, and is more likely to perform drug-related acts for conspiracy members in an effort to maintain his connection to them." Id. As the Third Circuit further explained:

> Chain-shaped conspiracies present the classic examples of interdependence. For instance, in Perez, 280 F.3d at 347, we concluded that two drug sellers and a drug smuggler were interdependent, even though there was a middleman between them, because "[the dealers] depended on a scheme involving [the smuggler and the middleman] and the shipment from the Philippines to possess and distribute the illegal drug." See also United States v. Portela, 167 F.3d 687, 697 (1st Cir.1999) (explaining that "a single conspiracy [exists] if the continued health of the trafficking and distribution network necessarily depends on the continued efforts of multiple suppliers"); United States v. Evans, 970 F.2d 663, 670 (10th Cir.1992) ("Interdependence is present when each alleged coconspirator ... depend[s] on the operation of each link in the chain to achieve the common goal." (alterations in original) (internal quotation marks omitted)).

The conspiracy involved a group of individuals who engaged in repeated crack cocaine sales within and around a defined geographical location – a playground in the area of 52nd Street and Westminster Avenue and its surrounding streets. The organization members that were engaged in those daily sales had defined roles and responsibilities (sellers and lookouts) and norms of operations (common distribution places and stash spots). The crack cocaine that was sold in street level amounts was often provided on consignment and always originated from the same supplier – Person #1. That supplier, repeatedly would resupply (re-up) the street level sellers with new amounts of crack cocaine once, the prior consignment was satisfied. Meanwhile, the

supplier always obtained the narcotics from the same bulk amount supplier – Robert Mack – from an area within the confines of the distribution territory. These methods of operation existed for years on end with Person #1 acting as the leader of the distributors, that engaged in purchased from Mack in order to distribute within the same geographical territory. As in many conspiracies of this nature, the operation of the conspiracy rested on the existence of long-term relationships depending upon trust and a mutual understanding of methods of operation.

The conspiracy moved enormous quantities of cocaine and crack cocaine along a chain from the higher level down to the street sellers who primarily sold in and around an area known colloquially as "the Grounds" – a playground/basketball court located near the intersection of 52nd Street and Westminster Avenue in the Mill Creek section of West Philadelphia. The territory of crack distribution was located within the playground basketball court, as well as within 1,000 feet of a second playground located at the intersection of 52nd Street and Wyalusing Avenue. This group employed joint action in the face of threats to their area or any of its members, consistent distribution relationships, common "stash houses," shared sales, - - all these are earmarks of a conspiracy. All bespeak a complex level of cooperation and coordination.

###    2.    Events Not Specifically Alleged in Count One

Title 21, United States Code, Section 846 does not require that the government allege or prove an overt act in order to prove a violation of the statute. There are a wide variety of facts adverted to in the indictment, count one; there are also a wide variety of facts that were not alleged in the indictment, but which prove the conspiracy. This additional evidence relates directly to the conspiracy, and is admissible despite the fact that it is not specifically discussed in the indictment. See United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999) (holding that defendant's

participation in uncharged acts of violence was admissible as direct proof of the conspiracy with which he was charged); <u>United States v. Thai</u>, 29 F.3d 785, 812-13 (2d Cir. 1994)   ("[i]t is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy . . . An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather it is part of the very act charged.")   (internal quotations and citations omitted).   In <u>United States v. Cross</u>, 308 F.3d 308 (3d Cir. 2002), the Third Circuit explained that "acts are intrinsic when they directly prove the charged [crime]."

### 3. <u>Admissibility of Co-Conspirator Statements</u>

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator.   In order for a court to admit the co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, (3) the statement was made in the course of the conspiracy; and 4) the statement was made in furtherance of the conspiracy.   <u>United States v. Bourjaily</u>, 483 U.S. 171, 175 (1987); <u>United States v. McGlory</u>, 968 F.2d 309, 333-34 (3d Cir. 1992); <u>United States v. Gambino</u>, 926 F.2d 1355, 1360 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. <u>Bourjaily</u>, 483 U.S. at 180-81. "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."   <u>Id</u>; <u>see also</u> <u>McGlory</u>, 968 F.2d at 334. The

district court should consider the totality of the circumstances when deciding the admissibility of such evidence.  "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court.  See Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); United States v. Traitz, 871 F.2d 368, 399 (3d Cir. 1989).  When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. Bourjaily, 483 U.S. at 175.

Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E).  Traitz, 871 F.2d at 399.  Accordingly, "statements of a co-conspirator identifying a fellow co-conspirator as his source of narcotics are statements made in furtherance of the conspiracy."  United States v. Lambros, 564 F.2d 26, 30 (8th Cir. 1977); see United States v. Munson, 819 F.2d 337, 341 (1st Cir. 1987); United States v. Anderson, 642 F.2d 281, 285 (9th Cir. 1981).

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation.  United States v. Gibbs, 739 F.2d 838, 843 (3d Cir. 1984); United States v. DePeri, 778 F.2d 963, 981 (3d Cir. 1985).  Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related.  United States v. Ammar, 714 F.2d 238, 253 (3d Cir.1983).  While mere narratives of past events or mere idle chatter that has no current purpose are not generally deemed to occur in furtherance of the conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness among

15

co-conspirators, or inform each other of the current status of the conspiracy" further the conspiracy.   Id, at 252; see United States v. Harris, 908 F.2d 728, 737 (11th Cir. 1990); United States v. Hudson, 970 F.2d 948, 958-59 (1st Cir. 1992).   For example, statements which are relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the conspiracy.   Ammar, 714 F.2d at 253.   In order for statements to be deemed "in furtherance of the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement was intended to promote the conspiracy, even if it did not actually do so.   See United States v. Williams, 989 F.2d 1061, 1068 (9th Cir. 1993); United States v. Mayes, 917 F.2d 457, 464 (10th Cir. 1990).

The trial court may admit statements pursuant to the Rule even if the statements relate to a conspiracy not charged in the indictment.   United States v. Ellis, 156 F.3d 493, 497 (3d Cir. 1998); United States v. Trowery, 542 F.2d 623, 626 (3d Cir. 1976).   The rationale for this rule is that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on the theory "that a person who has authorized another to speak or act to some joint end will be held responsible for what is later said or done by his agent . . ."   Trowery, 542 F.2d at 626.

## 4.    **Statements Against Interest**

Certain cooperating witnesses will testify regarding conversations held with and/or about other conspirators about the charged offenses. Specifically, testimony may involve witnesses stating that certain conspirators admitted to their own participation in crimes while also implicating the other in the same crimes.

Federal Rule of Evidence 804(b)(3), statement against interest, states that if the declarant is unavailable then a statement is admissible if:

(A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3).

Addressing the availability of a statement under Rule 804(b)(3) the Supreme Court stated, in United States v. Williamson, that the question under Rule 804(b)(3) is if the statement was sufficiently against the declarant's penal interest that it would not have been made unless the statement was true. 512 U.S. 594, 604 (1994). The analysis is "answered in light of all of the surrounding circumstances." Id. See also United States v. Moses, 148 F.3d 277, 280 (3d Cir. 1998). The statement must be actually self-inculpatory. "Where statements inculpate both the speaker and the defendant challenging their admission the statements are admissible so long as they were 'self-inculpatory' and not simply self-serving attempts to deflect criminal liability." United States v. Mussare, 405 F.3d. 161, 168 (3d Cir. 2005).

Additionally, pursuant to subsection (B) the statement must have corroborating circumstances indicating its trustworthiness. Concerns about the trustworthiness of the statement focus on the corroborating circumstances of the statement itself, not on whether the case corroborates the statement. United States v. Caldwell, 760 F.3d 267, 289 (3d Cir. 2014). Examinations of trustworthiness often weigh "real word" statements against law enforcement generated statements, with the former being more likely to be trustworthy. See e.g. Moses, 148 F.3d at 280-81 (comparing a custodial interview in United States v. Boyce, 849 F.2d 833 (3d Cir. 1998) to social interaction between friends). Indeed the Notes of the Advisory Committee to the

Rule state that, "A statement admitting guilt and implicating another person, while made in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest . . . on the other hand, the same word spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying." 28 U.S.C.A. Rule 804, p. 449 (1984).

A statement offered involving an unavailable declarant, such as a statement against interest, must also, however, pass muster under the Confrontation Clause.   Statement under Rule 804(b)(3) avoid Confrontation Clause concerns when the declarant could not have anticipated that the statement would be used against him in a future proceeding.   In such a context, the statement is not testimonial and thus, the Confrontation Clause does not apply.   See Davis v. Washington, 547 U.S. 813 (2006); United States v. Berrios, 676 F.3d 118, 126-7 (3d Cir. 2011).   Passing such an examination, the statement is admissible as to both a declarant/defendant and any co-defendant implicated in the statement.

Berrios is instructive as to the application of 804(b)(3).   In Berrios, Berrios and Moore were inside of a recreation area of a jail being surreptitiously recorded while discussing a crime that they committed with Rodriguez and Cruz. At trial the recorded statement was admitted as to all defendants. Id. at 123.   The Court found that the recorded conversation was non-testimonial. Id. at 127 citing to U.S. v. Hendricks, 395 F.3d, 173 180 (3d Cir. 2005), quoting Crawford v. Washington, 541 U.S. 36, 51 (2004)("a witness 'who makes a formal statement to government officers bears testimony in a sense that a person who makes a causal remark to an acquaintance does not,'").   The Court then continued to examine the recorded statement under Rule 804(b)(3) and determined that because "in no way was the recorded conversations 'self-serving,'" that it was

admissible as a statement against interest.   Id. at 129.   Similarly, many other courts have found

inmate-to-inmate conversations about their crimes to be non-testimonial.   See United States v.

Pellatier, 666 F.3d 1, 9 (1st Cir. 2011)(statements that criminals make to each other in jail "bear

none of the characteristics of testimonial hearsay.   They were made not under formal

circumstances, but rather to a fellow inmate with a shared history, under circumstances that did not

portend their use at trial.") citing to United States v. Smith, 383 Fed. Appx. 355, 357 (4th Cir.

2010); United States v. Spotted Elk, 548 F.3d 641, 662 (8th Cir. 2008); United States v. Johnson,

192 Fed. Appx. 935, 938 (11th Cir. 2006); United States v. Smalls, 605 F.3d 765, 778 (10th Cir.

2010); United States v. Johnson, 581 F.3d 320, 323-24 (6th Cir. 2009).

### 5.	Narcotics Dealing as Evidence of Motive to Possess Firearms

It is settled that evidence of narcotics dealing is admissible to show a defendant's motive

for possessing a firearm.   See, e.g., United States v. Jacobs, 44 F.3d 1219, 1225 (3d Cir. 1995)

("[e]vidence tending to show that the defendant was a participant in the selling of drugs was

relevant under Rule 402 and was admissible under Rule 404(b) to show that the defendant had a

motive for carrying a firearm"); United States v. Rankin, 902 F.2d 1344, 1346 (8th Cir. 1990)

("[e]vidence that [the defendant] possessed cocaine could establish a motive for possessing a

weapon").   United States v. Rivera, 844 F.2d 916, 926 (5th Cir. 1987) (evidence that defendant is

narcotics trafficker is evidence of motive to possess weapons).

Guns are an acknowledged "tool of the trade" in the drug business.   Possession of

weapons, in particular handguns, along with other evidence, is powerful circumstantial evidence

that an individual is in the drug trafficking trade.   United States v. Price, 418 F.3d 771, 779 (7th

Cir. 2005);   United States v. Adams, 759 F.2d 1099, 1108 (3d Cir. 1983) (admission of Uzi type

weapons during narcotics trial not unduly prejudicial; guns are "tools of the trade."). In this case the variety of firearms evidence is admissible to prove the drug conspiracy and other drug charges. Thus, in this case, the evidence of the drug trafficking conspiracy is relevant to and supports the allegations of gun possession and use by various defendants.

###    6.    **Evidence of Consciousness of Guilt**

The government intends to introduce several episodes of flight and resistance to the police by various defendants. These episodes are first of all in furtherance of the conspiracy, and admissible without more analysis. These episodes are also evidence of consciousness of guilt, and admissible as such against the defendants. United States v. Green, 25 F.3d 206, 210 (3d Cir. 1994) (flight by defendant after seeing police officer who defendant knew was aware of defendant's open warrants); United States v. Pungitore, 910 F.2d 1084, 1151 (3d Cir. 1990).

There were also several efforts by various defendants to hide evidence, or flee from police, during the course of this conspiracy. These episodes are admissible as actions in furtherance of the conspiracy, and as evidence of consciousness of guilt. See Ashcraft v. Tennessee, 327 U.S. 274, 277 (1946) ("[w]ilful concealment of material facts has always been considered as evidence of guilt."); United States v. Burrous, 147 F.3d 111, 117 (2d Cir. 1998) (throwing box of cash from window of car during arrest permitted inference of consciousness of guilt); United States v. Hackett, 638 F.2d 1179, 1186 (9th Cir. 1980) (flight, disposal of evidence permit inference of consciousness of guilt); Rivers v. United States, 270 F.2d 435, 438 (9th Cir. 1959) (dismemberment, disposal of body is evidence of consciousness of guilt in murder case).

Efforts to destroy evidence of the source of defendant's funds, in a drug case, is an act in furtherance of the conspiracy, as well as proof of consciousness of guilt.   United States v. Vogel, 132 Fed.Appx. 119, 121 (9th Cir. 2005) (not precedential).

### 7.       Threats to Witnesses

The government is aware of several instances of threats being made against cooperating witnesses and/or the witnesses' families by charged and uncharged individuals.    At this time, the government does not intend to put on any threat testimony at trial.    However, if the government for any reason decides that such testimony must be introduced, it will raise the issue with the court and counsel outside the presence of the jury, with ample time to deal with any objections out of the presence of the jury before hearing the testimony.

A variety of threats directed against witnesses have occurred through the course of this case.   Threats to witnesses are routinely introduced as conduct in furtherance of a criminal conspiracy.   See, United States v. Gibbs, 190 F.3d 188 (3d Cir. 1999);   United States v. Sherman, 440 F.3d 982, 991 (8th Cir. 2006).   As the Third Circuit put it,

> In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an "other" crime. The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused. Such proof ... may be extremely prejudicial to the defendant but the court would have no discretion to exclude it because it is proof of the ultimate issue in the case.
>
> Gibbs, 190 F.3d at 217-18.

Threats to a witness are also admissible as evidence of consciousness of guilt.   "Evidence of threats against witnesses is routinely admitted against criminal defendants to show consciousness of guilt." United States v. Garrison, 168 F.3d 1089, 1093 (8th Cir. 1999); see United States v. Gatto, 995 F.2d 449, 454 (3d Cir. 1993) (threatening look in courtroom admissible);

United States v. Gonzalez, 603 F.2d 1272, 1273 (11th Cir. 1983) (death threats evidence of consciousness of guilt); United States v. Guerrero, 803 F.2d 783, 786 (3d Cir. 1986) (death threats evidence of consciousness of guilt); United States v. Pinto, 394 F.2d 470, 471 (3d Cir. 1967) (death threat to witness "plainly admissible because it was relevant to show consciousness of guilt.")   An effort to assassinate a police witness is admissible to prove defendant's intent to continue in the conspiracy in which he was involved.   United States v. Velazquez, 410 F.3d 1011, 1016 (8th Cir. 2005).

**8.      Association With Other Conspirators**

While presence and association alone cannot establish a defendant's participation in a conspiracy, the jury is permitted to "consider presence and association, along with other evidence, in finding conspiratorial activity by the defendant." United States v. Chavez, 947 F.2d 742, 745 (5th Cir.1991).   United States v. Pompa, 434 F.3d 800, 806-07 (5th Cir. 2005); accord United States v. Mickelson, 378 F.3d 810, 821(8th Cir. 2004) (association, while not enough on its own to prove conspiracy, is admissible with other evidence to prove conspiracy).   Photographs of various defendants together is admissible to prove a conspiracy.   United States v. Price, 418 F.3d 771, 782 (7th Cir. 2005).   The government will introduce numerous instances where the police encountered various conspirators with each other and/or acting within the scope of the conspiracy. In addition the government will introduce testimony from police officers, customers, and co-conspirators that connect the conspirators together in a variety of contexts.

**9.      Counter-Surveillance Activity**

Defendants engaged in some counter-surveillance activity in this case, including, for instance, acting as lookouts for one another. Evidence that a defendant has conducted counter-

surveillance is admissible to prove defendant was involved in a drug conspiracy.   See Price, 418

F.3d at 779 (copy of "police alert" recovered in defendant's home admitted).

### 10.   **Drug Sales Not Involving Defendants**

Drug sales conducted during the course of a conspiracy, even when they did not involve a

defendant, are admissible to prove the nature and extent of the conspiracy, because each

conspirator is liable for the acts of his co-conspirators, undertaken during and in furtherance of the

conspiracy, even when he was not aware of the actions of his co-conspirators.   United States v.

Johnston, 353 F.3d 617, 624 (8th Cir. 2003).

### 11.   **Constructive Possession**

Possession of drugs or firearms need not be actual or exclusive.   "[O]wnership, dominion,

or control over the contraband itself, or dominion or control over the premises in which the

contraband is concealed. . ." amounts to "constructive possession."   United States v. Smith, 930

F.2d 1081, 1085 (5th Cir. 1991) (possession of firearms in house defendant co-occupied; defendant

not present when guns seized) (citations omitted).

> Constructive possession exists when a person . . . knowingly has the power and the
> intention at a given time to exercise dominion and control over an object, . . . and
> [it] may be proved by direct or circumstantial evidence.   It is not necessary that such
> evidence remove every reasonable hypothesis except that of guilt.
>
> United States v. Rivera, 844 F.2d 916, 925 (2d Cir. 1987) (possession of firearms in house

defendant co-occupied) (citations omitted).   "It is not necessary that the exercise of dominion and

control by others be disproved; it is only necessary that the evidence support the jury's finding that

[defendant] exercised dominion and control over the weapon."   Id., at 926.   See also, United

States v. DePugh, 993 F.2d 1362, 1364 (8th Cir. 1993) (gun found in residence; defendant not

present).

Similarly, narcotics may be constructively possessed by one exercising dominion and control over a house.   United States v. Wilson, 107 F.3d 774, 779 (10th Cir. 1997) (no direct evidence that defendant owned or rented premises; letters, documents and photographs of defendant found in upstairs bedroom; drugs found in yard).    Dominion and control can be inferred from use of a property, see Jackson v. Byrd, 105 F.3d 145, 150 (3d Cir. 1996).

**12.     Expert Testimony**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

Fed. R. Evid. 702.

Absent stipulations from defense counsels, the government will call the drug and firearms analysts involved in this investigation to testify regarding the testing conducted on the seized narcotics and firearms.

The government also expects to introduce expert testimony through a narcotics expert. "In cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade."    United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992); see also United States v. Watson, 260 F.3d 301, 308 (3d Cir. 2001) ("[E]xpert testimony concerning the modus operandi of individuals involved in drug trafficking does not violate Rule 704(b).").    It is well established that police officers may testify as experts concerning the methods and practices employed in a particular area of criminal activity, United States v. Pungitore, 910 F.2d 1084, 1149 (3d Cir. 1990), including the operations of a drug trafficking ring,

United States v. Ginsberg, 758 F.2d 823, 830 (2d Cir. 1985); United States v. Montas, 41 F.3d 775, 783-84 (1st Cir. 1994).   Courts have upheld the admissibility of expert testimony by investigative agents who are properly qualified as experts regarding the "tools of the trade" for narcotics trafficking.   United States v. Foster, 939 F.2d 445, 453 (7th Cir. 1991); United States v. Solis, 923 F.2d 548, 550-51 (7th Cir. 1991) (expert testimony upheld on the use of beepers in narcotics trafficking); United States v. Monu, 782 F.2d 1209, 1210-11 (4th Cir. 1986) (expert testimony upheld on the use of scales in the drug trade); United States v. Navarro, 90 F.3d 1245, 1259-60 (7th Cir. 1996).   In addition, "experienced narcotics agent[s] may testify about the significance of certain conduct or methods of operation to the drug distribution business, as such testimony is often helpful in assisting the trier of fact understand the evidence."   United States v. Griffith, 118 F.3d 318, 321 (5th Cir. 1997), quoting United States v. Washington, 44 F.3d 1271, 1283 (5th Cir. 1995).

The government intends to introduce the testimony of an expert in the operations of large drug trafficking organizations.   The expert's testimony, in this case, is admissible under Daubert, as he will provide a reliable opinion based on years of experience.   The district court should find that the expert possesses "areas of specialized knowledge outside the common experience of the jury," and that he is qualified to testify as an expert "in drug enterprises and their organization; as well as the trafficking in narcotics, including cocaine and crack."

This testimony, concerning a variety of aspects of drug trafficking organizations, is, in fact, specialized knowledge which is not within the purview of the average juror.   The testimony will provide detailed information about law enforcement techniques including surveillance, monitoring of various electronic communications, and the execution of search warrants.   In addition, his

expertise, gained through hundreds of investigations concerning how narcotics traffickers protect their turf, avoid losing the large amounts of currency they obtain, and attempt to avoid detection by police, is not knowledge available to the average citizen or juror.   The testimony is expected to include that the circumstances surrounding the seizure of different drug and drug paraphernalia evidence is consistent with distribution activity on a large scale, and not with possession for mere personal use.   Testimony is also expected to include that the circumstances surrounding the seizure of various firearms in this case are consistent with possession of the firearms to defend and extend drug trafficking assets and turf.

### 13.　　**Phone Records and Summary Chart**

The government has made available telephone records for cellular telephones described above.   The government expects to call ATF Special Agents Jason Santo and/or John Bowman as a summary witness to present these records in a summary chart form.   A draft copy of the summary chart will be provided to defense counsel prior to the start of trial.   The summary chart will save significant time in presenting the evidence.

### 14.　　**Cooperators - Plea Agreements**

There are certain witnesses who may testify during this trial who have pled guilty and have plea agreements with the government.   These defendants have had change of plea hearings before the Court.   The government has previously turned over in discovery each co-conspirator's plea agreement, as well as proffer letter.   Evidence of a witness' plea agreement is permissible to allow the jury to assess the witness' credibility, to eliminate any concern that the defendant has been singled out for prosecution, and to explain how the witness possessed detailed first-hand

knowledge regarding the events about which he testifies.   See United States v. Universal Rehab. Servs., Inc., 205 F.3d 657, 667 (3d Cir. 2000) (en banc).

In direct examination, the government intends to discuss the written plea agreement and discuss the witness' responsibilities under the terms of the agreements, including the witness' obligation to tell the truth.   Such testimony may properly be introduced by the government.   See United States v. Ramos, 27 F.3d 65, 67 n.4 (3d Cir. 1994).

The witness' intent to plead guilty and plea agreement may not be considered as evidence of the defendant's guilt.   See Universal Rehab. Servs., 205 F.3d at 668; United States v. Gaev, 24 F.3d 473, 476 (3d Cir. 1994); United States v. Gambino, 926 F.2d 1355, 1363 (3d Cir. 1991).   The Third Circuit has held that, in such cases, the jury should be instructed that it may not consider the guilty plea and/or plea agreement as evidence that the defendant is guilty of the offenses with which he is charged.   See Universal Rehab. Servs., 205 F.3d at 668; Gaev, 24 F.3d at 478. Accordingly, the United States respectfully requests that the Court give a cautioning instruction to the jury with respect to the testimony of the witness.   See Third Circuit Model Criminal Jury Instructions, § 2.22 ("Witness Who Has Pleaded Guilty to the Same or Related Charges").

**15.**   **Custodian of Records/Potential Stipulations**

The government will request that counsel stipulate to the following custodian of record testimony:

(1)      All telephone toll records, and

(2)      All witness/defendant prior convictions as are deemed relevant and admissible by the court.

**16.** **Exhibits - Presented in Electronic Format**

The government will provide the Court with an exhibit book and defense counsel with exhibit discs prior to the start of trial on October 9, 2018.   In addition, in order to move quickly and save significant time in presenting the evidence the government will have the exhibits loaded into a computer using the "Sanctions" program, to allow for their display electronically to the jury.

**17.** **Audio/Video Recordings and Transcripts**

The government has provided the audio/video recordings in this case.   The government will play certain video and audio recordings during trial and in order to save time in presenting this evidence the government may synchronize the recordings and transcripts electronically.

**18.** **Use of Agents' Reports to Cross-Examine Witnesses**

The government in this case will provide to the defense an abundance of reports of witness interviews by government agents.   To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents.   However under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports or notes.   United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992).

As a matter of evidence, the burden "of proving that notes reflect the witness' own words rather than the note-taker's characterization falls on the party seeking to introduce the notes."   Id. Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness' statement.   See Id. at 30.   In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise

inadmissible is not back-doored into evidence and read into the record.   See also United States v. Shoenborn, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993).

In Almonte, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried.   Id. at 28.   One defendant sought to impeach the agent by admitting interview notes taken by an Assistant U.S. Attorney who had interviewed the agent as a prior inconsistent statement.   Id. at 28-29.   The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant as an impeaching prior inconsistent statement and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization.   .   .   .   Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words.    The problem, in essence, is one of relevancy.    If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

Id. at 29 (citation omitted).

In this case, the defendant should not be permitted to cross-examine witnesses using any portion of the reports or to admit notes or reports to impeach the underlying subjects of those interviews, using any portion of the reports. Witnesses have not been shown the reports that were generated by the investigating agents and have not adopted those reports as their own statements.

## 19.    Proper Cross Examination of Witnesses with Prior Convictions

Rule 609 governs the appropriate boundaries for impeachment of witnesses by use of prior convictions.   Generally, relevant prior convictions whose fact of conviction may be used to

impeach a witness are those that are felonies that fall within a ten-year period and those that involve an element indicating a dishonest act or the making of a false statement. Even where the fact of a prior conviction is the subject of proper cross examination, any facts underlying a particular conviction are not relevant or the proper subject of cross examination. The government expects to discuss many of these issues with defense counsel in advance of trial and seek Court intervention on the propriety of cross examination on a particular conviction only where the parties do not agree.

## VI.    Other issues

Obviously, potential rebuttal witnesses exist, whose presentation would depend on whether defendants elect to present any defense, and if they do, what they or other witnesses say in the course of that defense.

Jury instructions, verdict sheets and voir dire have been filed under separate cover.

The United States requests that all witnesses, except for ATF Special Agents Jason Santo and Iman Ibrahim, the case agents participating in the investigation and assisting the United States at trial, be sequestered.

The government respectfully requests the ability to recall various witnesses who recovered firearms and narcotics from the surrounding area on multiple occasions if the need arises. This practice will allow the evidence to be presented in a chronological, coherent, and more efficient manner.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

_/S/ Jonathan B. Ortiz_____
JONATHAN B. ORTIZ
SETH SCHLESSINGER
Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that a true and correct copy of the Government's Trial Memorandum has been served by me, this date, by email upon the following individuals:

Michael Drossner
Halim Drossner P.C.
1528 Walnut Street, Suite 1501
Philadelphia, PA 19102
*Attorney for Robert Mack*

Lynanne B. Wescott
The Westcott Law Firm, PC
1221 Locust Street, Suite 301
Philadelphia, PA 19107
*Attorney for Kenneth Riley*

Thomas C. Egan III
621 Swede Street
Norristown, PA 19401
*Attorney for James Wilson*

Coley O. Reynolds
Omnis Law Group LLC
1515 Market Street, Suite 1210
Philadelphia, PA 19102
*Attorney for Mark Samuel*

Noah Gorson
Gorson & Gorson, P.C.
1845 Walnut Street, Suite 1300
Philadelphia, PA 19103
*Attorney for Xavier Towel*

          /S/ Jonathan B. Ortiz_____
          JONATHAN B. ORTIZ
          SETH SCHLESSINGER
          Assistant United States Attorneys

DATED: September 10, 2018